Entered: October 1st, 2020
Signed: September 30th, 2020
**SO ORDERED**



NANCY V. ALQUIST
U. S. BANKRUPTCY JUDGE

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF MARYLAND
### (Baltimore Division)

| | |
|---|---|
| In re: | Bankr. Case No. 17-18561-NVA |
| Robert Glen Cockey, II, | |
| Debtor. | (Chapter 7) |
| Stefan Popescu | |
| and | Adv. Pro. No. 17-00360-NVA |
| Gough Street Liquor, LLC, | |
| Plaintiffs, | |
| v. | |
| Robert Glen Cockey, II, | |
| Defendant. | |

## MEMORANDUM DECISION REGARDING
## <u>COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT</u>

In this case, the debtor is a young man who, right out of college, entered into an agreement to operate and manage a tavern in Baltimore, Maryland. The other party to this business agreement owned the business and the real property housing the tavern. The parties envisioned that, as payment for his services in running the tavern, the debtor would be entitled to its "profits." Unfortunately for everyone, the management agreement governing their dealings failed to define

adequately the meaning of the term "profits." Inevitably, the parties disagreed on what the term means. After the debtor filed this bankruptcy case, his former colleague in the tavern business made a claim against him for a debt which he alleges was incurred by the debtor's false representations, fraud, embezzlement, or larceny and is thus nondischargeable under Section 523(a)(2) and (a)(4) of the Bankruptcy Code. The Court finds that the plaintiffs have failed to establish a case for nondischargeability, and enters judgment for the Debtor.

## PROCEDURAL POSTURE

This matter is before the Court pursuant to the Complaint to Determine Dischargeability of Debt (the "Complaint") filed by plaintiffs Stefan Popescu ("Mr. Popescu") and Gough Street Liquor, LLC ("Gough Street" and, together with Mr. Popescu, the "Plaintiffs"). [ECF No. 1]. Through this adversary proceeding, the Plaintiffs are seeking a determination of nondischargeability under 11 U.S.C. §§ 523(a)(2) (false representation), 523(a)(4) (embezzlement), and/or 523(a)(4) (larceny) of a debt owed by debtor/defendant Robert Glen Cockey, II (the "Debtor")).[1]

In his Answer to Adversary Complaint to Determine Dischargeability of Debt (the "Answer"), the Debtor controverted most of the material allegations against him and consented to entry of final orders and judgment by this Court.[2] [ECF No. 7]. Various pre-trial proceedings were held, and discovery was taken. Before trial, the Debtor consented to the entry of partial summary judgment that "the amount of damages, if not subject to discharge, are determined to be $82,998.84." See Defendant's Consent to Entry of Partial Summary Judgment, [ECF No. 44], and Order Granting Motion for Partial Summary Judgment (the "Consent Judgment"). [ECF No. 45].

---

[1] The Plaintiffs and the Debtor are collectively referred to herein as the "Parties."
[2] In the Complaint, the Plaintiffs admitted that this is a core proceeding under 28 U.S.C. § 157.

An evidentiary trial was held in this matter (the "Trial"), at which the Court heard testimony from the Debtor, Mr. Popescu, Robert Cockey, Sr. ("Mr. Cockey, Sr."), took into evidence the facts stipulated to in the Joint Stipulation of Undisputed Facts (the "Stipulation of Facts") submitted by the Parties, and various exhibits, admission of which was stipulated to by the Parties, and heard closing arguments. [ECF No. 60; Transcr.[3] at 11:25-12:7]. At the conclusion of the Trial, the Court requested (i) supplemental briefs from the Parties and (ii) proposed findings of fact and conclusions of law from the parties. [ECF Nos. 63-65]. These post-trial submissions were made, and the Court took the matter under advisement. This memorandum decision constitutes the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

## JURISDICTION

The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

## FINDINGS OF FACT

Based upon the record, including the Stipulation of Facts, and giving due regard to the Court's ability to assess the credibility of witnesses, the Court finds as set forth below. To the extent there was a conflict in the evidence, the Court resolves such conflict consistent with these findings.

1.  Gough Street is a company owned entirely by Mr. Popescu. Stipulation of Facts at ¶ 1. Gough Street operates a restaurant and bar in Baltimore, Maryland. Id. at ¶ 2.

2.  Pursuant to the Lease Agreement dated as of February 1, 2014 (the "Lease") between 1901 S. Gough Street, LLC ("Landlord") as landlord, and Gough Street, as tenant, Gough Street leased the premises known as the Commercial Space Within the Building known as 1901

---

[3] The Transcript of the Evidentiary Hearing held on October 17, 2019, Popescu and Gough Street Liquor, LLC v. Robert Glen Cockey, II, Adv. Pro. 17-00360-NVA shall be referred to herein as "Transcr."

Gough St., Baltimore, Maryland 21231 (the "Premises"). Id. at ¶ 3; Ex. 11, Lease at p. 1. The Lease is signed by Mr. Popescu as "owner" of the Landlord and as "owner" of Gough Street. Id. at p. 22.

3. The Lease provided for "base rent" in the amount of $2,000 per month, subject to an annual compounding escalation set forth in the Lease, beginning on the first anniversary of the "Lease Commencement Date."[4] Ex. 11, Lease at ¶ 1. Gough Street's obligation to pay "Rent" commenced two months after the Lease Commencement Date, and Rent was due on the first day of each month. Id. at p. 1. The term "Rent" includes base rent only. Id. Gough Street was also obligated to pay additional amounts, including taxes, insurance, and certain utilities as "Additional Rent." Ex. 11, Lease at ¶¶ 4 & 6.

4. Gough Street, Mr. Popescu, and the Debtor are parties to a Management Agreement dated as of March 1, 2014 (the "Management Agreement"). Stipulation of Facts at ¶ 4, Ex. 1, Management Agreement. The Management Agreement governed the Plaintiffs' and the Debtor's rights and obligations with respect to the operation of the "Tavern"[5] on the Premises. According to its terms, the Management Agreement commenced on March 1, 2014 and was scheduled to terminate on February 28, 2024 (the "Operating Term"). Stipulation of Facts at ¶ 4; Ex. 1, Management Agreement at ¶¶ 1 & 2.[6]

---

[4] The "Lease Commencement Date" is defined as "the date when Landlord delivers Premises to Tenant with Landlord's Work substantially completed." Ex. 11, Lease at 1.

[5] The "Tavern" is defined in the Management Agreement as "the Tavern located on the Property." "Property" is not defined in the Management Agreement, but based upon the Stipulation of Facts, the text of the Lease (referencing the location as 1901 Gough Street), and the evidence presented at trial, appears to mean the "Premises" (as defined herein), and the Court so finds. The Tavern was operated under the trade name "Cockey's Fells Point." Stipulation of Facts at ¶ 9.

[6] The Debtor began operating the Tavern shortly before the Management Agreement as executed. Stipulation of Facts at ¶¶ 7 & 60.

5. Pursuant to the Management Agreement, the Debtor was engaged "as the exclusive operator of the Tavern during the Operating Term." Ex. 1, Management Agreement at § 3; Stipulation of Facts at ¶¶ 6, 8, & 61.

6. The Debtor's job as operator of the Tavern was his first job post-college. Cockey Dep.[7] 170:2-6. He had never owned, operated, or managed a restaurant or other business prior to the Tavern. Cockey Dep. at 170:2-6; Transcr. at 33:9-10; Stipulation of Facts at ¶ 10. His only prior restaurant employment experience was as a bartender and server. Cockey Dep. at 170:4-6. Although not a party to the Management Agreement, Mr. Cockey, Sr. was the individual with experience, upon whom both Mr. Popescu and the Debtor relied for advice and guidance in connection with the Tavern. Transcr. at 81:9-82:4; Popescu Dep.[8] 52:17-53:3; 91:1-91:18.

7. As the operator, the Debtor was responsible for, among other things, all expenses of operating the Tavern, which included all expenses related to compensation of employees, rent, sales taxes, cost of alcoholic beverages, utility charges related to the Premises, cleaning costs for the Premises, repairs of equipment, and insurance. Ex. 1, Management Agreement at §§ 3, 5, 7, 8; Stipulation of Facts at ¶ 12; Transcr. at 37:6-9. These expenses included Rent and "triple net" expenses related to the Lease, i.e. real estate taxes, building insurance, and maintenance. Stipulation of Facts at ¶ 15 and 16; Ex. 1, Management Agreement at §§ 3, 7-9, 21.

8. In exchange for his operation of the Tavern, the Debtor was entitled to retain all profits from the operation of the Tavern. Ex. 1, Management Agreement at § 3(e) (stating "All profits shall inure to the benefit of the [Debtor]"); Stipulation of Facts at ¶¶ 13, 62, 66 The Management Agreement further states: "Profits. The [Debtor] shall be entitled to all profits after payment of all expenses. The [Debtor] shall pay any and all expenses with regard to the operation

---

[7] The Deposition of Robert G. Cockey, II (February 20, 2018) ("Cockey Dep.")
[8] The Deposition of Stefan Popescu (April 26, 2018) ("Popescu Dep.")

of the business at the location and add the [Plaintiffs] on all insurance policies as an additional insured until the transfer of the Liquor License." Ex. 1, Management Agreement at § 21. The Parties stipulated that "[t]he term 'Profits' was not defined in the Management Agreement." Stipulation of Facts at ¶ 63.

9. Gough Street was the "controlling party of the liquor license, which gave the Debtor the right to operate and redeem all profits of the business." Stipulation of Facts at ¶ 5.

10. Under the Management Agreement, the Debtor was required to keep "adequate books of account and other records reflecting the results of operations at the [T]avern," and the Plaintiffs had "full access to such books and records for examination, audit, inspection, transcription." Ex. 1, Management Agreement § 6.1; Stipulation of Facts at ¶ 20. The Debtor was required to provide copies of the "monthly retail sales tax returns for the prior calendar month, along with a copy of the check, draft, electronic funds transfer notice, and/or other evidence of tax payment by the 25th of day of each calendar month." Ex. 1, Management Agreement at § 6.2; Stipulation of Facts at ¶ 21.

11. Mr. Cockey, Sr. maintained the books and accounting records for the Tavern. Stipulation of Facts at ¶ 27; Transcr. at 139:21-140:13. The Debtor did not review the book-keeping ledger maintained by Mr. Cockey Sr. for accuracy. Stipulation of Facts ¶ 28. The Debtor did not keep an accounting of his personal expenses. Stipulation of Facts at ¶ 40; Cockey Dep. at 209:11-19.

12. The Tavern used a point of sale system called a "Micros System" into which the bartender or server would enter a guest's order, the system would provide the order information for the kitchen, and the system would be used to "cash out" the check. Transcr. at 33:19-34:3. The Micros System would track sales for the day and the month; however, there would be some

discrepancy between the amount recorded in Micros Systems and the actual amount deposited because, among other things, Micros Systems did not separately account for tips, and would not allow the operator to deduct amounts that were not paid, for example when an order was changed or the meal was provided without charge. Transcr. at 33:16-36:9.

13. The Debtor paid certain business expenses in cash, including the pizza vendor, bread vendor, and purchases at Restaurant Depot. Transcr. at 39:17-40:9; Stipulation of Facts at ¶ 39. The Management Agreement required all alcohol purchases to be COD. Ex. 1, Management Agreement at § 5.2; Stipulation of Facts at ¶ 67.

14. The Debtor opened two bank accounts for the business using the EIN number for Gough Street – one account for operating expenses (the "Operating Account") and the other account for payroll. Transcr. at 78: 19-79:8; Stipulation of Facts at ¶¶ 29, 30, & 69.[9] The Debtor was the only authorized signer on the account, and the Debtor and Mr. Cockey, Sr. had the only two debit cards for the Operating Account. Transcr. at 79: 13-25; Stipulation of Facts at ¶ 31.[10] Mr. Popescu was aware of the accounts, but he did not have access to the accounts until after the Debtor was terminated as operator of the Tavern. Stipulation of Facts at ¶¶ 34 & 70.

15. The funds in the accounts were from the operations of the Tavern. Stipulation at ¶ 33; Transcr. at 122:24-123:4. The credit card receipts were automatically deposited into the Operating Account, and the Debtor deposited the cash receipts into the Operating Account. Stipulation of Facts at ¶ 33; Transcr. at 73:13-73: 14; 122:24-123:4.

16. The Debtor did not pay all of the expenses of the Tavern. Transcr. at 37:6-12; Cockey Dep. at 17:12-16; Stipulation of Facts ¶ 26. He did not pay any triple net payments in

---

[9] The Debtor used the Gough Street EIN number to open the accounts because the checks to pay for alcohol need to have the same EIN number as the holder of the liquor license. Cockey Dep. at 54:6-15.
[10] The debit cards were in the name of "Cockey's Fells Point." Stipulation of Facts at ¶ 32.

2014, but he began making some payments toward the triple net amounts in 2015. Transcr. at 89:8-90:18.

17. The Debtor did not make all of the Rent or all of the triple net payments owed under the Lease in 2015. Transcr. at 83:22-24; 84:20-23; Ex. 19 (January through December 2015). According to Mr. Popescu, numerous additional expenses were unpaid in late 2015, including expenses for alcohol and other vendors. Transcr. at 107:23-109:8.

18. The Debtor admitted that he used funds from the Operating Account for non-business expenses, including purchases at retailers, for food, car payments, and hotels. Stipulation of Facts at ¶¶ 47-54. The Debtor admitted that he used funds from the Operating Account for gentlemen's clubs, golfing, restaurants, dining, and sporting equipment, but asserted that these were legitimate business expenses. Stipulation of Facts at ¶¶ 41, 43-45.

19. At times, the Debtor would use the debit card if his personal card was declined and would subsequently repay such amounts. Stipulation of Facts at ¶ 51.

20. The banking records also show that cash withdrawals were made at various businesses, including at the Horseshoe Casino, the Royal Farms convenience store, and the ATM at the Tavern. Stipulation of Facts at ¶¶ 42 & 46; Ex. 4. The Debtor testified that the cash withdrawals were made to pay employee tips, to stock the registers, and to pay certain vendors and other business expenses. Transcr. at 40:17-41:22; 48:1-12.

21. The Debtor used funds from the operating account to purchase a gun for his personal safety while working late nights at the Tavern. Transcr. at 49:5-21. After being informed by Mr. Popescu that he could not have a gun on the Premises due to insurance restrictions, the Debtor no longer brought the gun on the Premises. *Id.* He did not repay the business for the

8

amounts used to purchase the gun, and he believes that he personally owns the gun. Transcr. at 50:1-9; Stipulation of Facts at ¶ 56.

22.     The Debtor also used funds to purchase equipment for a restaurant that was to be opened at 32 North Chester. Stipulation of Facts at ¶ 37. The 32 North Chester property was to be owned and operated under terms similar to that of the Tavern. Cockey Dep. at 46:9-17; Transcr. at 134:8-135:25. The Debtor formed a company called Amerta, LLC ("Amerta") that would own the restaurant at the 32 North Chester location. Transcr. 60:1-3.

23.     In the Debtor's view, the funds in the Operating Account represented "profits" from the sale of food and drink at the Tavern, and he was entitled to use those amounts to pay expenses or for personal use. Cockey Dep. at 17:17-18:3; 126:15-127:18; 167:2-8169:2-7; 211:22-212:16; Transcr. at 64:6-66:14. He believes that the personal expenditures he made were all either from these profits or were amounts he borrowed and repaid. Cockey Dep. at 126:15-127:18.

24.     The Court finds the Debtor to be a credible witness. His testimony, both at trial and at his deposition, consistently supported his view that the gross profits from the Tavern were his to use. Nothing in his testimony indicated that his use of the funds was motivated by a desire to deprive the Plaintiffs of their property or otherwise indicative of fraudulent intent.

25.     The Debtor consented to the entry of partial summary judgment that "the amount of damages, if not subject to discharge, are determined to be $82,998.84." See Defendant's Consent to Entry of Partial Summary Judgment and Consent Judgment, [ECF Nos. 44-45].

## DISCUSSION

Section 523(a) of the Bankruptcy Code[11] provides that certain debts are excepted from discharge. These exceptions are construed narrowly, to preserve the Bankruptcy Code's

---

[11] 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code").

overarching purpose of providing a fresh start to an honest, but unfortunate debtor. *See Nunnery v. Rountree (In re Rountree)*, 478 F. 3d 215, 219 (4th Cir. 2007); *Kuper v. Spar (In re Spar)*, 176 B.R. 321, (Bankr. S.D.N.Y. 1994) ("To meet the goals intended under the Code, exceptions to discharge must be strictly and literally construed against the creditor and liberally construed in favor of the honest debtor."). To establish its claim, the creditor must show that the debt falls squarely within one of the enumerated exceptions of Section 523(a). *See Palmacci v. Umpierrez*, 121 F. 3d 781, 786 (1st Cir. 1997)(citing cases). The creditor bears the burden of proving each element of its claim, by the preponderance of the evidence. *See Rountree*, 478 F.3d at 220; *Grogan v. Garner*, 498 U.S. 279, 291 (1991). A creditor's failure to establish a single element is fatal to its claim. *See Palmacci*, 121 F.3d at 788 (stating that if the creditor failed to establish any of the elements, the court should reject his claim)*; Spar*; 176 B.R. at 326 (same).

Analyzing whether a creditor holds a nondischargeable claim is a two-step process. The creditor must first establish that a debt is owed to the creditor by the debtor. *See Ortman v. Reinheimer (In re Reinheimer)*, 509 B.R. 12, 14-15 (Bankr. D. Md. 2014). Here, the Debtor has consented to entry of partial summary judgment of damages in the amount of $82,998.84 owed to the Plaintiffs; accordingly, the first step has been satisfied. *See* Defendant's Consent to Entry of Partial Summary Judgment, [ECF No. 44]; Order Granting Motion for Partial Summary Judgment, [ECF No. 45]. Once the debt is established, the question becomes whether the debt is nondischargeable under Section 523(a). *See Reinheimer*, 509 B.R. at 14-15.

Here, the Plaintiffs assert that the debt is nondischargeable on three independent grounds. They aver that the debt is (i) based upon false pretenses, false representations, or actual fraud under § 523(a)(2); (ii) for embezzlement under § 523(a)(4); and/or (iii) for larceny under § 523(a)(4). The Court addresses each claim below.

### A. 11 U.S.C. § 523(a)(2) –False Representation, Actual Fraud.

The Plaintiffs maintain that Debtor engaged in the making of false representations and fraud for purposes of Section 523(a)(4) by failing to perform under the Management Agreement and by subsequently promising that he would pay the expenses owed under the Management Agreement.

To establish a claim under §532(a)(2), the creditor must prove:

1. That a representation was made by the debtor;
2. That the debtor knew the representation was false when it was made;
3. That the representation was made with the intent and purpose of deceiving the creditor;
4. That the creditor justifiably relied upon the false representation; and
5. That the creditor suffered damages as a result.

*Reinheimer*, 509 B.R. at 18; *Palmacci*, 121 F.3d at 786; *Kuper*, 176 B.R. at 326; *Ward v. Wyatt (In re Wyatt)*, 87 B.R. 874, 877-78 (Bankr. E.D. Va. 1988). The failure to perform under a contract or the failure to perform in the *future* is not a false representation unless, at the time the contract was entered or the promise was made, the debtor did not intend to perform. *See Reinheimer*, 509 B.R. at 19 ("[T]he failure to subsequently perform a contractual promise of future performance does not automatically cause the promise to be found a false representation as an element of the tort of fraud."); *Palmacci*, 121 F.3d at 787. This is true even if the debtor subsequently, and without excuse, refuses to perform. *Palmacci*, 121 F.3d at 787.

Here, the Plaintiffs contend that the Debtor made false representations (i) by signing the Management Agreement promising to, among other things, pay the expenses of the Tavern and not retain any profits until after the expenses were paid and (ii) by subsequently promising that he would "get current" on his obligations. *See* Plaintiffs' Proposed Findings of Fact and Proposed

11

Conclusions of Law at p. 21 [ECF No. 64]. In the Plaintiffs' view, because the Debtor failed to comply with these terms of the Management Agreement and because the Debtor never became current on his obligations (including the triple net lease payments), his promises were false representations.

The Plaintiffs argue that the types of expenses themselves are "badges of fraud," sufficient to establish the Debtor's fraudulent intent. *See* Transcr. at 153:15-20. Although fraudulent intent may be inferred from the circumstances, it cannot be presumed. *See Spar*, 176 B.R. at 328; *Wyatt*, 87 B.R. at 878. Evidence of performance can rebut an inference of fraudulent intent. *See Spar*, 176 B.R. at 328 (citing cases).

The Court holds that the Plaintiff has not satisfied its burden of proving that the representations were false at the time they were made by the Debtor or that the Debtor made the representations with fraudulent intent. The evidence in this case establishes that, after the Management Agreement was entered, the Debtor significantly performed his obligations under the Management Agreement, including by paying Rent and other expenses throughout 2014, much of 2015, and in 2016 (prior to being locked out of the Premises). Transcr. at 80:9-16; Ex. 19. The record further shows that the Debtor attempted to become current – among other things, he began making payments on the triple net charges in 2015. Transcr. at 88:13-90:18; Ex. 19.

The Plaintiffs also have not met their burden of providing justifiable reliance. Operating the Tavern was the Debtor's first job after college. Cockey Dep. at 170:2-6. At the time the Management Agreement was entered, the Debtor had no experience owning, operating, or even managing a bar or restaurant. Transcr. at 33:9-10; 103:22-104:12; Cockey Dep. at 170:2-6; Stipulation of Facts ¶ 10. The evidence shows that the Plaintiff was relying on the expertise of

Mr. Cockey, Sr., rather than the Debtor, in entering the Management Agreement.  Popescu Dep. at 52:17-53:3; 91:1-91:18.

In addition, from the very first month of the Management Agreement, the Debtor was not making the triple net payments under the Lease.  Because Mr. Popescu also owned the Landlord and was the resident agent for Gough Street, the Plaintiffs were aware of the unpaid Rents, and other expenses that the Debtor was not paying.  Transcr. at 107:1-109:6; Ex. 11, Lease at p. 22.  Under the Management Agreement, the Plaintiffs were supposed to be receiving monthly reports of the retail sales tax returns, together with evidence of payment and had access to the books and records of the Tavern.  Ex. 1, Management Agreement at § 6.  There is no evidence that the Plaintiffs ever obtained or sought this information during the course of the Debtor's operation of the Tavern.  Accordingly, because the Plaintiffs knew that the Debtor was not paying the expenses of the Tavern, and the Plaintiffs had the right and ability to review the books and records, the Plaintiffs have not established justifiable reliance.

### B.  11 U.S.C. § 523(a)(4) – Embezzlement and Larceny

The Plaintiffs allege that the Debtor engaged in embezzlement by using funds from the operation of the Tavern for his personal use, without first paying the expenses owed.  At trial, the Plaintiffs argued that, even the Debtor's use of funds to purchase a handgun was a legitimate business expenses and therefore not embezzlement, the Debtor's subsequent retention of the gun was larceny.

Section 523(a)(4) excepts debts for "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  The elements of embezzlement and of larceny are established by federal common law, rather than state law.  *See The Harbour Bank of Md. v. Anderson (In re Anderson)*, Consol. Adv. Pro. No. 15-00685-WIL, 2018 WL 1475981 *18 (Bankr.

D. Md. March 23, 2018) *slip op.*; *T. Levy Assocs., Inc. v. Kaplan (In re Kaplan)*, 608 B.R. 443, 456 (Bankr. E.D. Penn. 2019). "Fraudulent intent is the key to a finding of embezzlement or larceny and may be established by circumstantial evidence." *Anderson*, 2018 WL 1475981 * 18.

### a. Embezzlement

Embezzlement requires the Plaintiffs to prove: (1) that the funds were rightfully in the possession of the Debtor; (2) that the Debtor appropriated the funds for a use other than that for which it was entrusted; and (3) circumstances indicating fraud. *See Anderson*, 2018 WL 1475981 *18; *Cash Am. Fin. Servs., Inc. v. Fox, (In re Fox)*, 370 B.R. 104, 116 (6th Cir. 2007); *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 602 (5th Cir. 1998) ("Embezzlement is defined for purposes of § 524(a)(4) as the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come.") (citations omitted).

"To meet the definition of 'embezzlement,' there must be proof of the debtor's fraudulent intent in taking the property." *Miller*, 156 F.3d at 602-03; *see also, e.g.*, *Anderson*, 2018 WL 1475981 * 18; *Fox*, 370, B.R. at 117 (noting that embezzlement under § 523(a)(4) requires actual, intentional fraud and citing cases). Fraudulent intent means intent to defraud, to deceive, or to act in bad faith. *See Kaplan*, 608 B.R. at 457; *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 274-75 (2013) (noting that both embezzlement and larceny require a showing of wrongful intent – such as a showing of moral turpitude, intentional wrong, or felonious intent); *Alternity Capital Offering 2, LLC v. Ghaemi (In re Ghaemi)*, 492 B.R. 321, 326 (Bankr. D. Colo. 2013) ("Historically, both larceny and embezzlement have consistently had a criminal intent requirement.")

It is not enough to show that the Debtor took property belonging to the Plaintiffs without their consent and without lawful justification – i.e., that the Debtor converted the Plaintiffs' property. The Plaintiffs must show that the Debtor had a fraudulent or unlawful intent, directed at

the Plaintiffs, at the time of the claimed misappropriation. *See Ghaemi*, 492 B.R. at 326 (noting that embezzlement differs from conversion because embezzlement requires criminal intent, while conversion requires only a specific intent to take the property); *Kaplan*, 608 B.R. at 457 (stating that embezzlement requires proof of fraudulent intent directed at the owner, while conversion requires only the simple intent to exercise dominion or control over property that is inconsistent with the owner's rights).[12] Where the debtor's dominant purpose is to benefit himself or his company, rather than to harm the creditor, fraudulent intent is not established. *See Fox*, 370 B.R. at 117-18 (finding that because debtor's intent in withdrawing funds was to recoup his capital investment and benefit his own property, rather than to harm the creditor, the debtor did not have the requisite intent).

Indeed, one can wrongfully appropriate property under a mistaken believe of entitlement without giving rise to a claim of embezzlement. *See Miller*, 156 F.3d at 603 (holding that the jury's finding that the defendant wrongfully appropriated property did not include a finding of fraudulent intent); *In re Kelley*, 84 B.R. at 231 (holding that the debtor's appropriation of funds would not constitute embezzlement absent a showing of fraudulent intent); *Great Am. Ins. Co. v. Storms (In re Storms)*, 23 B.R. 761, 765 (Bankr. E.D.N.C. 1983) ("Even where the facts of a case show some relation of trust requiring a debtor to hold funds for another, the debtor's subsequent appropriation of the funds will not amount to embezzlement absent proof of the debtor's fraudulent intent.")

Fraudulent intent may be shown through circumstantial evidence;[13] however, a showing of fraudulent intent may be negated by evidence that the debtor used the property "openly, without

---

[12] Conversion and embezzlement also differ because in embezzlement, the original possession must be rightful, while in conversion it is not. *See, e.g. Kaplan*, 608 B.R. at 456.
[13] *See, e.g.*, *Anderson*, 2018 WL 1475981 * 1

15

attempt to conceal, and had reasonable grounds to believe he had the right to so use." *Storms*, 28 B.R. at 765; *Fox*, 370 B.R. at 117; *Kelley*, 84 B.R. at 231.

The Plaintiffs assert that the Debtor's personal use of funds from the operations of the Tavern before paying all expenses owed constitutes embezzlement.[14] Under the Management Agreement, all expenses of operating the Tavern were the responsibility of the Debtor, and all profits inured to the benefit of the Debtor. *See* Ex. 1, Management Agreement at § 3(d) & (e). Section 21 of the Management Agreement is entitled "Profits" and states "The [Debtor] shall be entitled to all profits after payment of all expenses. The [Debtor] shall pay any and all expenses with regard to the operation of the business at the location. . . ."

The Parties stipulated that the Management Agreement does not define profits. *See* Stipulation of Fact at ¶ 63. The Debtor testified that the funds received from the sale of food and drink at the Tavern were "profits" and that he was entitled to use these amounts to pay expenses and for his own personal use. In the Debtor's view, all of the personal expenditures he made were from "profits" or were amounts he borrowed and repaid.[15] Cockey Dep. at 17:17-18:3; 126:15-127:18; 167:2-8169:2-7; 211:22-212:16. Mr. Popescu also testified that the funds in the Operating Account were the Debtor's, at least until the Management Agreement was terminated and Mr. Popescu gained control of the Operating Account. Transcr. at 122:24-123:10.

The Plaintiffs have not established fraudulent intent. The Debtor testified that he believed he was entitled to use the funds as he saw fit. The Plaintiffs presented no evidence that the Debtor's

---

[14] The Debtor contends that there was an oral modification of the Management Agreement, pursuant to which he was not required to pay triple net amounts owed under the Lease in 2014. The Plaintiffs dispute that there was an oral modification of the Management Agreement. The Parties also dispute whether certain charges were for legitimate business expenses or the Debtor's personal expenses. The Court does not have to decide these issues, because the Parties have stipulated to the amount of damages, and have stipulated (and the evidence shows) that from at least 2015 on the Debtor did not pay all expenses owed under the Management Agreement, and that the Debtor made certain non-business expense purchases using funds from the Operating Account. In light of these stipulations, whether or not the Debtor was current on his obligations in 2014 is not dispositive.

[15] The Debtor believed that his purchase of the gun was a business expense. Transcr. at 49:5-50:9.

16

dominant purpose in using the funds was to harm the Plaintiffs; rather, the evidence demonstrates that the Debtor's purpose in using the funds was to pay for his personal expenses, for entertainment purposes, and to purchase restaurant equipment for the Debtor's business "Amerta."

Moreover, the evidence shows that the Debtor used the funds openly, without concealment.[16] At times, Mr. Popescu was with the Debtor when the Debtor used the funds for entertainment purposes. Transcr. at 82:8-12; 133:14-19; Cockey Dep. at 81:9-22. Mr. Popescu was with the Debtor on at least one occasion when the Debtor attended an auction to purchase restaurant equipment for Amerta, and the equipment was stored in a warehouse that Mr. Popescu had access to. Transcr. at 85:7-23; 100:1-4; 135:10-18

Similarly, the Plaintiffs' claim that the Debtor embezzled funds to purchase the gun also fails. The Debtor purchased the gun for protection when he was at the Tavern late at night, as a business expense. Transcr. at 49:13-21. He kept it on the Premises until he was told by Mr. Popescu that he could not have the gun on the Premises, at which point he did "not bring it to the restaurant any longer." Transcr. at 49:13-21. The Plaintiffs have not produced any evidence to establish the Debtor purchased the gun with fraudulent intent, and even if they had, the Debtor's open possession of the gun would tend to negate such a showing.

The Plaintiffs have not satisfied the element of fraudulent intent. Accordingly, they have not established a claim for embezzlement.

In addition, the Plaintiffs have not proven by a preponderance of the evidence that the Debtor wrongfully appropriated the funds. The Debtor credibly testified that he believed that the term profits meant the gross profits (i.e. revenue) from the operations of the Tavern. As discussed above, the Parties stipulated that the Management Agreement does not define the term "profits."

---

[16] A finding of concealment is not required to prove fraudulent intent; the absent of concealment, however, may negate a showing of fraudulent intent.

One reasonable definition of the term could be "net profits" – i.e. profits after payment of all expenses. Another reasonable definition of the term could be "gross profits" – i.e. the "the total receipts minus the cost of goods sold." *In re Gossett*, 86 B.R. 941, 942 (Bankr. S.D. Ohio 1988); *see also* MERRIAM-WEBSTER'S UNABRIDGED DICTIONARY[17] (defining profit as "2: the excess of returns over expenditures in a transaction or series of transactions *especially* the excess of the selling price of goods over their cost.") The Plaintiffs have not produced evidence to support their reading over that of the Debtor. Because of this, the Plaintiffs have not met their burden of establishing that the Debtor appropriated funds for a use other than that for which they were entrusted.[18]

    **b. Larceny**

The Plaintiffs argue that even if the Debtor's original purchase of the gun was a legitimate business expense, his subsequent retention of the gun without repaying the business constitutes larceny under Section 523(a)(4). "To establish a claim for larceny under § 523(a)(4), the plaintiff must show that the defendant unlawfully misappropriated [property] for his or her own benefit and that he did so with fraudulent intent that was malicious and wrongful." *See Anderson*, 2018 WL1475981*18. To commit larceny, the original taking of the property must be wrongful. *See Storms*, 28 B.R. at 765. Here, the Debtor used funds from the operations of the Tavern to purchase

---

[17] *https://www.merriam-webster.com/dictionary/profits*.

[18] At trial, the issue of the legal ownership status of funds held in an account was raised, and the parties submitted post-trial briefing on this issue. ECF Nos. 63 & 65. Neither party produced any authority to support an argument that the mere deposit of funds by the Debtor into the bank account transformed the nature of ownership in the funds. In his post-trial brief, the Debtor argued that the Plaintiffs made a gift of the proceeds to the Debtor "by delivering dominion, control, and possession of the funds on deposit" to the Debtor, but there is no credible evidence to support this claim. Rather, the evidence demonstrates that the Debtor opened the bank accounts and deposited the funds. Transcr. at 73:13-24; 80:1-8. There is no evidence of any intent or any act by the Plaintiffs to make a gift of the funds to the Debtor. *See Wagner v. State*, 220 Md. App. 174, 190, 102 A.3d 900, 909–10 (2014), aff'd, 445 Md. 404, 128 A.3d 1 (2015) (holding that although joint ownership of an account creates a presumption of ownership interests in both parties, such presumption can be overcome by evidence that original owner did not intend to give a gift); Shaffer v. Lohr, 264 Md. 397, 408, 287 A.2d 42, 48 (1972) ("[A] valid inter vivos gift will only be found where the donor makes a distinct, unequivocal delivery of the passbook with an intent to part with ownership and make an irrevocable gift of the fund and the donee accepts the gift.")

the gun.  His original possession of the funds was lawful – i.e., as operator, he was entitled to collect the revenues from the Tavern and deposit them in the Operating Account.  As a result, his subsequent use of the funds cannot be larceny.

In addition, as discussed above, the Plaintiffs did not prove that the Debtor acted with fraudulent intent.  He purchased the gun for protection while working at the Tavern, and he stopped bringing it to the Tavern when Mr. Popescu informed him that the Debtor could not have the gun on the Property due to insurance limitations. Transcr. at 49:13-17.  There is no evidence that he acted with malicious or wrongful intent toward the Plaintiffs.  The lack of fraudulent intent is fatal to the Plaintiffs' larceny claim.

## CONCLUSION

Because the Plaintiffs have failed to prove their case under §§ 523(a)(2)(A) and 523(a)(4), the Court will enter judgment in favor of the Debtor.  According, based upon the foregoing and the record before the Court, it is, by the United States Bankruptcy Court for the District of Maryland, hereby

**ORDERED**, that judgment is hereby ordered in favor of the Debtor, Robert Glen Cockey, II.

###END OF ORDER###